FIRST JUDICIAL DISTRICT
THIRD DIVISION
March 23, 2011

No. 1-09-2335

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | APPEAL FROM THE |
| Plaintiff-Appellee, | ) | CIRCUIT COURT OF |
| | ) | COOK COUNTY |
| | ) | |
| v. | ) | No. 08 CR 14289 |
| | ) | |
| | ) | HONORABLE |
| DONNELL PERKINS, | ) | JAMES MICHAEL OBBISH, |
| Defendant-Appellant. | ) | JUDGE PRESIDING. |

JUSTICE STEELE delivered the judgment of the court, with opinion.

Justices Neville and Murphy concurred in the judgment and opinion.

**OPINION**

Following a bench trial in the circuit court of Cook County, defendant Donnell Perkins was found guilty of attempt aggravated criminal sexual abuse. The circuit court sentenced Perkins to five years in prison. Perkins now appeals, arguing: (1) he did not commit the offense as a matter of law; (2) trial counsel was ineffective in failing to adequately cross-examine a key witness and had a *per se* conflict of interest in arguing his ineffectiveness after the trial; and (3) his sentence is excessive. For the following reasons, we reject these arguments and affirm the judgment of the circuit court.

BACKGROUND

The record on appeal discloses the following facts. Perkins was charged by indictment with one count of aggravated criminal sexual abuse (sexual contact with a child under 13 years old) and three counts of criminal sexual abuse. Prior to trial, the State moved to admit out-of-

court statements from A.M., the six-year-old victim, to her grandmother and a child advocate, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2008)). At the hearing, Deano Beasley Cunningham, A.M.'s maternal grandmother, testified that during the early morning hours of July 7, 2008, she received a telephone call that prompted her to go to Mount Sinai Hospital. Upon arriving at the hospital, she found A.M. sitting in her mother's lap. A.M. looked sad, while Lakesha M., A.M.'s mother, was hysterical.

Cunningham testified that she asked A.M. what happened. According to Cunningham, A.M. said that her ponytail was pulled, a man hit her on the forehead and cheek and touched her "private part." Cunningham began recording A.M.'s statements with a crayon belonging to A.M.'s sister, E.M. A.M. indicated that she was struck with an open hand. A.M. then stated that she had been lying down in her room with her sister when Donnell dragged her out of the room without her permission. Cunningham identified "Donnell" as Perkins, who lived in the house with A.M.'s mother. Cunningham stated that she had known Perkins for approximately 3½ years.

Cunningham asked A.M. what happened next. A.M. responded that she fell asleep again. A.M. told Cunningham that Perkins was in his bed with her. Perkins wore no clothes and touched her. A.M. further told Cunningham that when Perkins touched her "private area," her panties were down around her ankles. Cunningham testified that she was overwhelmed by these statements and left the room. Cunningham did not observe whether there was any swelling or discoloration of A.M.'s forehead or jaw.

Roziya Lumpkins, a forensic interviewer with the Chicago Children's Advocacy Center (CAC), testified that she had conducted over 500 interviews of children in cases of alleged sexual

abuse. On July 7, 2008, after meeting with a police detective and assistant State's Attorney, Lumpkins interviewed A.M. in an interview room with child-sized furniture and a one-way mirror connected to an observation room. After establishing that A.M. knew the difference between the truth and lies, Lumpkin had A.M. promise to tell the truth while they talked.

While discussing her family, A.M. said she had a "grandfather" named Donnell who was "mean." When Lumpkins asked A.M. why she said that, A.M. responded that Donnell pulled her hair and dragged her to a back room where "her brother's toys were." Lumpkins asked what happened after that and A.M. said that she was asleep. A.M. told Lumpkins that her "grandfather" had taken her clothes off, but she did not know how or where he did it. A.M. also told Lumpkins that he had removed his own clothes, but she did not see him do so.

A.M. further stated that she was lying down and he was lying down behind her. A.M. said she did not feel anything weird on her body. A.M.'s mother then came into the room and awakened her by turning on the light. Donnell jumped up. A.M. said his clothes were off, but she awakened with her shirt on. A.M. recalled that she had gone to bed that night wearing her shirt, a skirt and panties. A.M. said that nothing "happened" to either her vaginal or "butt" area.

The State rested. Perkins chose to rest without presenting evidence. The circuit court granted the State's motion to admit A.M.'s out-of-court statements.

At trial, A.M. testified that on the night of July 7, 2008, she was at home with her mother, sister, brother and Perkins. A.M. went to sleep with her sister and brother (I.M.), although her brother shared a room with Perkins. A.M. testified that the next thing she remembered was waking up in I.M.'s room, in a bed with Perkins. A.M. did not remember how she got there.

A.M. was lying on her side, facing the wall, with Perkins behind her, facing the same direction. A.M. said she did not know what happened while she was in bed with Perkins. A.M. also testified that she went to sleep wearing a shirt and princess underpants and was wearing the same when her mother entered the room and awakened her.

A.M. further stated that her mother took her to the hospital, where she met her grandmother, but did not tell her what happened. According to A.M., she then went to CAC, where she spoke to Lumpkins. A.M. said she told Lumpkins what happened because she remembered what happened when she was talking to Lumpkins.

A.M.'s mother, Lakesha M., testified that in July 2008, she lived at 4333 West Madison Street, above a storefront with her three children and Perkins. She stated that she had known Perkins since childhood. Perkins did not pay rent, but watched Lakesha M.'s children while she attended school and worked.

Lakesha M. testified that on July 6, 2008, she worked and then went to a movie, arriving home between 10:05 and 10:25 p.m. She put her children to bed, then went to her room and fell asleep watching television. She was awakened by her youngest daughter, who said that A.M. was not in her room. She began calling for A.M. and checking the various rooms of the house.

Lakesha M. further testified that when she reached the door of her son's room, she saw a "back and forth" movement in the bed. Perkins was in bed, not wearing a shirt, with a sheet pulled up to his waist. She stated that she turned on the light and saw A.M. in the bed, between Perkins and the wall, with Perkins behind A.M. She added that A.M. was wearing her night shirt,

but her panties were pulled down past the knees. A.M. was asleep, but awakened when Lakesha M. turned on the light.

Lakesha M. then testified that she pulled the sheet off the bed. She said that Perkins was fully undressed and had an erection. According to Lakesha M., Perkins seemed shocked, sat up and said, "Check her. Is she okay?"

Lakesha M. took A.M. from the bed to the bathroom to check her condition. She then called her son's father and the police. After the police arrived, she took A.M. to Mount Sinai Hospital and CAC.

The State sought to call Cunningham as a witness. However, the trial judge denied the State's request because A.M. testified that she did not tell Cunningham what happened.

Lumpkins gave testimony that was substantially similar to her testimony on the pretrial motion. The State then rested. Perkins moved for a directed finding. The trial judge granted the motion for a directed finding on the charges of aggravated criminal sexual abuse and criminal sexual abuse, but denied the motion as to the lesser included offenses of attempted aggravated criminal sexual abuse and one count of attempted criminal sexual abuse.

Perkins testified on his own behalf that he was 49 years old and considered himself a "stepfather" to Lakesha M. Perkins stated that on July 6, 2008, he returned home at approximately 11 or 11:30 p.m., after spending the day at church and his aunt's house. Perkins testified that he told the children to go to bed, then went to his room and took his medicine, including Dilantin.

Perkins also testified that he became dizzy from the heat that day and went to lie down. Perkins stated that he went to bed in his pajamas and there was no one in the bedroom with him. Perkins said that he awakened when he heard Lakesha M. yelling at him. Perkins sat up, stunned, to see Lakesha M. and A.M. standing in the doorway. According to Perkins, he questioned Lakesha M.'s reaction and she responded that he knew what Lakesha M.'s daddy did to her and what "the other dude" did to her in May. Perkins said that he replied, "Ain't nothing [like] that going to happen now."

Perkins further testified that he followed Lakesha M. back to her bedroom, asking what happened. He then returned to his bedroom, after telling her to call the police in response to her accusations. Perkins denied dragging A.M. from her bed, pulling her hair, taking her clothes off, lying behind her, or trying to penetrate or have sex with her. Perkins stated that he did not know A.M. was in his bed and did not know how she got there.

The defense then rested. Following closing arguments, the trial judge found Perkins guilty of attempted aggravated criminal sexual abuse and attempted criminal sexual abuse, with the latter charge merged into the former. The trial judge also found that Perkins had taken a substantial step toward the commission of attempted aggravated criminal sexual abuse, based on A.M.'s mother's testimony, which the trial judge found highly credible. The trial judge further found that Perkins had no explanation for why he was naked when discovered by Lakesha M.

Defense counsel filed a posttrial motion for a new trial, arguing: (1) the evidence was insufficient to convict; (2) the court erred in allowing the case to proceed on the attempt charges; and (3) counsel was ineffective, because he would have cross-examined A.M.'s mother differently

if he had known that the case could proceed on the attempt charges. The trial judge denied the posttrial motion, then proceeded to sentencing. At the sentencing hearing, defense counsel sought probation, arguing that Perkins was 49 years old with no prior criminal record and no prior incidents while living with A.M.'s mother, and he was a deacon at his church. Perkins maintained his innocence. The trial judge sentenced Perkins to five years in prison and denied his motion to reconsider the sentence. Perkins then filed a notice of appeal to this court.

DISCUSSION

I. Sufficiency of the Evidence

Defendant contends he was not proved guilty of attempted aggravated criminal sexual abuse of A.M. beyond a reasonable doubt because, as a matter of law, his acts did not constitute a substantial step toward the commission of criminal sexual abuse. Generally, "[i]n reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Jordan*, 218 Ill. 2d 255, 269, 843 N.E.2d 870, 879 (2006). A reviewing court does not retry the defendant and should not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *Sutherland*, 223 Ill. 2d at 242, 860 N.E.2d at 217. However, where defendant does not challenge the credibility of witnesses, but instead questions whether the uncontested facts were sufficient to

prove the elements of the offense, our review is *de novo*. *In re Ryan B.*, 212 Ill. 2d 226, 231, 817 N.E.2d 495, 497-98 (2004).

"A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2008). Determining when mere preparation to commit an offense ends, and perpetration of an offense begins, is one of the most "troublesome" areas in the law of inchoate offenses. *People v. Terrell*, 99 Ill. 2d 427, 433, 459 N.E.2d 1337, 1340 (1984). Thus, what constitutes a substantial step is determined by the facts and circumstances of each particular case. *People v. Smith*, 148 Ill. 2d 454, 459, 593 N.E.2d 533, 535 (1992). Although the accused need not have completed the "last proximate act" to actual commission of a crime, mere preparation is not enough. *Terrell*, 99 Ill. 2d at 433, 459 N.E.2d at 1340. A substantial step should put the accused in a "dangerous proximity to success." (Internal quotation marks omitted.) *People v. Hawkins*, 311 Ill. App. 3d 418, 423-24, 723 N.E.2d 1222, 1226 (2000).

Illinois courts have relied on the Model Penal Code for guidance in determining whether an accused has taken a substantial step toward commission of a crime. See *Terrell*, 99 Ill. 2d at 435-36, 459 N.E.2d at 1341-42. Under the Model Penal Code, an attempt has occurred when a person, acting with the required intent, "purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Model Penal Code §5.01(1)(c) (1985). The Model Penal Code lists types of conduct that shall not, as a matter of

law, be held insufficient to support an attempt conviction, so long as the act is strongly corroborative of the actor's criminal purpose, including:

> "(a) lying in wait, searching for[,] or following the contemplated victim of the crime;
>
> (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;
>
> (c) reconnoitering the place contemplated for the commission of the crime;
>
> (d) unlawful entry of a structure, vehicle[,] or enclosure in which it is contemplated that the crime will be committed." Model Penal Code §5.01(2) (1985).

This list manifests the Model Penal Code's emphasis on the nature of steps taken, rather than on what remains to be done to commit a crime. As noted in the comments to section 5.01 of the Model Penal Code, "[t]hat further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." (Internal quotation marks omitted.) *Hawkins*, 311 Ill. App. 3d at 424, 723 N.E.2d at 1227 (quoting Model Penal Code §5.01, cmt. 6(a) (1985)).

Perkins focuses on the question of whether thrusting his hips was a substantial step toward the commission of sexual conduct with a victim under 13 years of age. See 720 ILCS 5/12-16(c)(1)(I) (West 2008). "Sexual conduct" in this case means any intentional or knowing touching or fondling by the accused, either directly or through clothing, of the sex organs, anus or breast of the victim, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the

victim, for the purpose of sexual gratification or arousal of the accused. 720 ILCS 5/12-12(e) (West 2008). However, the proper analysis is not limited to the last act – or any single act – Perkins took. For example, in this case, Perkins did not entice the intended victim of the crime to go to the place contemplated for its commission. Rather, the uncontested evidence showed that Perkins grabbed A.M. by her ponytail and dragged her there. The uncontested evidence here showed that Perkins was found naked, with an erection, making a back and forth motion directly behind A.M. on what the trial judge described as a single bed, while A.M.'s underwear were pulled down past her ankles. In short, the evidence was sufficient as a matter of law to show that Perkins took more than one substantial step toward the commission of the offense of criminal sexual abuse of a child under 13 years old.

Perkins argues that the trial judge found that his hip-thrusting, without contact, was done for a sexual reason, and thus, was an end in itself, rather than a substantial step to committing sexual conduct with a victim under 13 years of age. Indeed, Perkins claims – without reference to evidence from the record – that he had ample time to commit the underlying offense, but did not. A review of the transcript shows that the trial judge was not referring to the hip-thrusting alone, but stating that the entirety of the evidence summarized here showed that Perkins acted with the intent of sexual arousal and gratification. The fact that Perkins was already sexually aroused does not mean that his acts were not also a substantial step toward the commission of the offense.

Moreover, Perkins argues that the specific intent element of attempted sexual assault cases is typically established by showing that the defendant had the requisite intent, but was thwarted between taking the substantial step and the commission of the offense. See, *e.g.*, *People v.*

*Patterson*, 314 Ill. App. 3d 962, 970-71, 734 N.E.2d 462, 469 (2000); *People v. Kleba*, 110 Ill. App. 3d 345, 354, 442 N.E.2d 605, 612 (1982); *People v. Oetgen*, 62 Ill. App. 3d 29, 32-34, 378 N.E.2d 1355, 1358-59 (1978). However, none of these cases establish that the thwarting of the attempt is necessary to prove the requisite intent. Moreover, *Kleba* and *Oetgen* are both cases of attempted rape, where the facts necessary to show attempt will almost necessarily be greater that those needed to show an attempted criminal sexual abuse. Perkins also cites Wisconsin's attempt statute on this point (Wis. Stat. Ann. §939.32(3) (West 2010)), but that statute refers to the "intervention of another person or some other extraneous factor," while the Illinois attempt statute does not. Furthermore, Perkins overlooks the fact that the evidence in this case shows that his activities were discovered by Lakesha M.

In sum, Perkins has failed to show that the evidence was legally insufficient for the trier of fact to find him guilty of attempted aggravated criminal sexual abuse.

## II. Ineffective Assistance of Counsel

Perkins next claims that he received ineffective assistance of counsel because his counsel failed to anticipate that Perkins could be convicted of attempt, leading counsel to inadequately cross-examine A.M.'s mother. Generally, in order to show ineffective assistance of counsel, a defendant must establish: (1) counsel's representation fell below an objective standard of reasonableness; and (2) counsel's alleged deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We must show great deference to the attorney's decisions as there is a strong presumption that an attorney has acted adequately. *Strickland*, 466 U.S. at 689. A defendant must overcome the strong presumption the challenged action or

inaction "might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999) (and cases cited therein). Every effort must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *People v. Calhoun*, 404 Ill. App. 3d 362, 383, 935 N.E.2d 663, 682 (2010) (and cases cited therein). To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If a reviewing court finds that the defendant did not suffer prejudice, it need not decide whether counsel's performance was constitutionally deficient. *People v. Buss*, 187 Ill. 2d 144, 213, 718 N.E.2d 1, 39 (1999).

Perkins argues, as did trial counsel in the posttrial motion for a new trial, that had trial counsel considered the possibility of an attempt conviction, he would have questioned A.M. and more vigorously questioned her mother on issues including whether A.M. ever engaged in sleepwalking, whether A.M. ever slept in her brother's room, whether A.M.'s underwear was tight-fitting, and whether A.M.'s mother had knowledge of Perkins's anatomy. In denying the posttrial motion, the trial judge commented that he did not know how counsel's questioning could have been any more effective, noting that counsel effectively had the more serious charges dismissed. The trial judge also commented that Perkins's account of what occurred lacked credibility. The trial judge's comments, counsel's success in obtaining a directed verdict on the

more serious underlying offenses, and the fact that Perkins cannot show that the answers to the hypothetical cross-examination would have aided his case convince us that Perkins has failed to show that the representation in this case was constitutionally deficient or that the result of the proceeding would have been different.

Perkins also argues that he received ineffective assistance because trial counsel argued his own ineffectiveness in the posttrial proceedings. A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Taylor*, 237 Ill. 2d 356, 374, 930 N.E.2d 959, 970 (2010). The Illinois Supreme Court has identified two categories of conflicts of interest: *per se* and actual. *Taylor*, 237 Ill. 2d at 374, 930 N.E.2d at 971 (and cases cited therein). Perkins claims counsel had a *per se* conflict in arguing his own ineffectiveness. If a *per se* conflict is found, there is no need to show that the conflict affected the attorney's actual performance. *Taylor*, 237 Ill. 2d at 374-75, 930 N.E.2d at 971. Unless a defendant waives his or her right to conflict-free representation, a *per se* conflict of interest is grounds for automatic reversal. *Taylor*, 237 Ill. 2d at 374-75, 930 N.E.2d at 971.

The Illinois Supreme Court has outlined three situations where a *per se* conflict exists: (1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant. *Taylor*, 237 Ill. 2d at 374, 930 N.E.2d at 971. The State correctly notes that an attorney arguing his own ineffectiveness does not fall within any of these three categories. Perkins cites *People v. Lawton*, 212 Ill. 2d 285, 296,

-13-

818 N.E.2d 326, 333 (2004), for the proposition that "[a]n attorney cannot be expected to argue his own ineffectiveness," but more strongly, the court there called it an "inherent" conflict of interest.

However, the issue in *Lawton* was whether a defendant forfeits a postconviction or postjudgment claim of ineffective assistance where appellate counsel was also trial counsel. See also *People v. Keener*, 275 Ill. App. 3d 1, 5, 655 N.E.2d 294, 297 (1995) (recognizing the conflict in discussing forfeiture); *People v. Willis*, 134 Ill. App. 3d 123, 133, 479 N.E.2d 1184, 1191 (1985) (calling it a *per se* conflict where attorney would be required to argue his own ineffectiveness on a motion to withdraw a guilty plea and defendant ultimately questioned his attorney in adversarial manner). It is far from clear that the recognition of a conflict of interest in the context of forfeiture or the context of an attorney representing a defendant on appeal or other postjudgment proceedings, means that it is a constitutional *per se* conflict of the sort warranting automatic reversal outside those situations. In cases where the defendant raised the ineffective assistance claim in the trial court, this court has refused to hold a *per se* conflict of interest exists any time an attorney raises his own ineffectiveness or that appointment of new counsel is required, particularly when not requested by the defendant. See, *e.g.*, *People v. Jones*, 219 Ill. App. 3d 301, 304, 579 N.E.2d 1192, 1194 (1991) (and cases cited therein). A *per se* conflict of interest does not exist merely because a defense attorney's competence is questioned by his client during posttrial proceedings; rather, the underlying allegations of incompetence determine whether an actual conflict of interest exists. *People v. Davis*, 151 Ill. App. 3d 435, 443, 502 N.E.2d 780, 785 (1986) (and cases cited therein).

In this case, Perkins did not make a *pro se* complaint against his trial counsel. Rather, his trial counsel voluntarily and zealously asserted the claim on behalf of his client. Moreover, Perkins is represented by new counsel on appeal who was unencumbered by any conflict in arguing ineffective assistance by trial counsel and did so zealously. Thus, we conclude that the concerns raised in *Lawton, Keener* and *Willis* are not present here and no *per se* conflict exists in accordance with this court's prior rulings in *Jones* and *Davis*.

### III. Sentencing

Lastly, Perkins argues that his five-year prison sentence was excessive. It is well established that the sentence imposed by a trial court is entitled to great deference. When the sentence is within the statutory limits, it may be disturbed only where the trial court has abused its discretion. *E.g.*, *People v. Bosley*, 233 Ill. App. 3d 132, 139, 598 N.E.2d 355, 360 (1992) (and cases cited therein). So long as the trial court " 'does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense.' " *Bosley*, 233 Ill. App. 3d at 139, 598 N.E.2d at 360 (quoting *People v. Hernandez*, 204 Ill. App. 3d 732, 740, 562 N.E.2d 219, 225 (1990)). The trial court has no obligation to recite and assign value to each factor presented at a sentencing hearing. *People v. Baker*, 241 Ill. App. 3d 495, 499, 608 N.E.2d 1251, 1253 (1993). Where mitigating evidence is presented to the trial court during the sentencing hearing, we may presume that the trial court considered it, absent some indication, other than the sentence itself, to the contrary. *People v. Dominguez*, 255 Ill. App. 3d 995, 1004, 626 N.E.2d 775, 783 (1994).

Attempted aggravated criminal sexual abuse is sentenced as a Class 3 felony (see 720 ILCS 5/8-4(c)(4), 12-16(g) (West 2008)), with a range of two to five years' imprisonment (730 ILCS 5/5-8-1(a)(6) (West 2008)). Thus, the sentence imposed was within the statutory range. Perkins argues that the trial judge did not place enough weight on the mitigating factors of his age and lack of a felony criminal record, presented to the trial court for consideration. Indeed, the transcript shows that the trial judge specifically commented on the lack of a felony criminal record.

Perkins also argues that the trial judge misinterpreted his maintaining his innocence as "some sort of acceptable behavior." A trial court should not automatically and arbitrarily consider a defendant's insistence on his or her innocence as an aggravating factor when sentencing him. *People v. Ward*, 113 Ill. 2d 516, 529, 499 N.E.2d 422, 427 (1986). However, under other circumstances, that continued insistence and defendant's concomitant lack of remorse "may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society." *Ward*, 113 Ill. 2d at 528, 499 N.E.2d at 426. These circumstances might well include the unshaken credibility of the victim or a defendant's highly dubious version of events. *People v. Barger*, 251 Ill. App. 3d 448, 468, 624 N.E.2d 405, 417 (1993). Under such circumstances, the trial court can properly consider a defendant's lack of remorse or denial of guilt as it affects his prospects for rehabilitation. See *People v. Anderson*, 225 Ill. App. 3d 636, 653, 587 N.E.2d 1050, 1062 (1992).

In this case, the transcript shows that the trial judge did not find Perkins's version of events credible. The transcript also shows that Perkins expressed only remorse for what "they"

1-09-2335

put A.M. through in this case. Thus, it is not surprising that the trial judge would infer that defendant's insistence on innocence, in the face of the evidence presented at trial, and the suggestion that others were responsible for any trauma to A.M., reflected a continuing dishonesty and opposition to society. The transcript also shows that the trial judge discussed Perkins's lack of remorse in rejecting the defense argument that Perkins would never put himself in this situation again, *i.e.*, in assessing the potential for rehabilitation. Accordingly, we conclude that Perkins has failed to show that the circuit court abused its discretion in sentencing Perkins to five years in prison.

CONCLUSION

In sum, we conclude that the evidence was legally sufficient to convict Perkins of attempted aggravated criminal sexual abuse. Perkins did not receive ineffective assistance of trial counsel and did not establish a constitutional *per se* conflict of interest on the part of his trial counsel. Lastly, we conclude that the trial court did not abuse its discretion in sentencing Perkins to five years in prison. For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.